IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIV. NO. 14-00214 JMS-RLP |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| vs. | ) | JUDGMENT, DOC. NO. 66 |
| | ) | |
| STATE OF HAWAII AND STATE | ) | |
| OF HAWAII DEPARTMENT OF | ) | |
| TRANSPORTATION, AIRPORTS | ) | |
| DIVISION, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DOC. NO. 66

## I. INTRODUCTION

On May 5, 2014, Plaintiff United States of America ("Plaintiff") filed this action asserting claims against Defendants State of Hawaii and State of Hawaii Department of Transportation, Airports Division ("HDOT") (collectively, "Defendants") for violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Plaintiff alleges that (1) Defendants subjected former HDOT employee Sherry Valmoja ("Valmoja") to a hostile work environment by failing to prevent and correct alleged sexual harassment by former HDOT employee Mark Morris ("Morris"), and (2) various HDOT employees

retaliated against Valmoja for engaging in protected activity related to the alleged sexual harassment.  Plaintiff seeks compensatory damages, front and back pay, and injunctive relief.

Currently before the court is Defendants' Motion for Summary Judgment, arguing that Plaintiff has failed to establish a genuine issue of material fact in support of any of its claims.  Based on the following, the court DENIES Defendants' Motion for Summary Judgment.

///

///

///

///

///

///

///

///

///

///

///

///

## II. <u>BACKGROUND</u>

### A. **Factual Background**[1]

At all times relevant to this action, Valmoja was a canine handler with

the Transportation Security Administration's ("TSA") Explosive Detection Canine

Training Program ("EDCTP") at Honolulu International Airport.  Valmoja was

initially employed by Akal Security, Inc. ("Akal"), who, with the TSA and HDOT,

were all contractually interconnected to manage and administer this program.  *See*

Doc. No. 66-4, Sidney Hayakawa Decl. ¶ 3.  On April 1, 2009, HDOT severed its

contractual relationship with Akal, excluding Akal from the EDCTP at the airport.

*Id.*  As a result, the canine handlers who were previously employed by Akal,

---

[1] Both parties' recitations of the facts and evidence show a fundamental misunderstanding regarding the purpose and proper content of a concise statement setting forth material facts -- to assist the court in understanding the critical facts of the case to determine whether there is a genuine issue of material fact.  Defendants provided a concise statement containing seventeen "facts," Doc. No. 69, but also included in their Memorandum 46 numbered paragraphs spanning 28 pages of additional factual allegations.  *See* Doc. No. 66-1.  Because these numerous facts were not included in the concise statement, the court has "no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statement."  Local Rule 56.1(f).  And in response, Plaintiff provided its own concise statement, which both addressed Defendants' concise statement and outlined additional "facts" which Plaintiff asserts are disputed.  Many of Plaintiff's additional "facts," however, are not facts and instead consist of legal assertions of retaliation (which the court disregards).  *See, e.g.*, Doc. No. 109, Defs.' Additional Facts ¶¶ 33-36.  And nowhere does Plaintiff outline its own version of facts of the case based on the evidence it presents, instead providing snippets throughout its argument.  As a result of this hodge-podge by both parties, the court is left with little help in sorting through the parties' numerous exhibits, understanding the basic facts of this case, and pinpointing the parties' actual points of dispute.  The court therefore outlines the facts as best it can based on the parties' deficient submissions.

including Valmoja, became independent contractors under Personal Service

Contracts ("PSC") with HDOT, and entered into one-year contracts for service.

*Id.*; Doc. No. 66-9, Defs.' Ex. 2.

Plaintiff alleges that Valmoja was sexually harassed by her co-

worker, Mark Morris, during their employment with Akal and continuing during

their employment with HDOT, until HDOT chose not to renew Morris' PSC in

March 2011.  Plaintiff further asserts that Valmoja complained about this conduct

to her K-9 Unit Supervisor Ronald Ome, and that those up the chain of command,

including, among others, the administrative services officer in charge of the

personnel office in the airports division, Sidney Hayakawa, and HDOT Contract

Specialist Chris Murphy, who assisted with the canine handlers' PSCs, retaliated

against her for making such complaints.  The court details the evidence regarding

these allegations in more detail.

### 1.    *Valmoja's Initial EEOC Complaint of Harassment*

On March 31, 2009, just prior to the transition from Akal to HDOT,

Valmoja filed an EEOC complaint against Akal alleging various claims, including

that from November 2008 through February 2009, her co-worker, Mark Morris,

repeatedly sexually harassed her.  In particular, Valmoja asserted that Morris "has

made unwelcome sexual comments and sexual innuendos toward me by calling me

his 'brown baby'; he has repeatedly stated that he likes the way I put my make up on; and he likes the way my perfume smells and it makes him want to do things toward me." *See* Doc. No. 66-8, Defs.' Ex. 1 at 00005.  She further relayed that in one instance, Morris grabbed her, hugged her, and tried to kiss her, and then laughed at her when she told him not to touch her. *Id.*

### 2.    *May 22, 2009 Incident and Second EEOC Complaint*

On May 22, 2009, another incident occurred between Valmoja and Morris when he confronted her about her EEOC complaint.  *See* Doc. No. 66-11, Defs.' Ex. 4.  In an email to her K-9 Unit Supervisor Ronald Ome, Valmoja asserted that Morris had "interrogated" her about her EEOC complaint, and told her that "management told him what was going on." *Id.*  She further explained that she felt that she could not speak to management because she believed that TSA employee Lyle Combs ("FCC Combs") "protects Morris and fosters the sexual discrimination to occur." *Id.*  Ome responded that he would formally warn Morris not to have contact with her, open an investigation, and notify HDOT. *Id.*

On May 26, 2009, Morris was given a written warning stating that "as a result of an EEOC complaint made against you for sexual harassment by Sherry Valmoja, you are hereby instructed not to have any contact with or to retaliate against her as a result of the actions being taken," and that failure to comply

"could result in disciplinary action against you which could include termination." Doc. No. 66-12, Defs.' Ex. 6.  Valmoja asserts that despite this written warning, Morris continued to harass her by following her around the airport and staring at her.  *See* Doc. No. 113-1, Pl.'s Ex. 1 at 85-86, 137-38.

By May 2009, HDOT was aware of Valmoja's allegations regarding Morris.  *See* Doc. No. 66-4, Hayakawa Decl. ¶ 4.  HDOT's Civil Rights Coordinator, Rey Domingo, asserts that in August 2009, he assigned EEO/AA Coordinator Terry Kim to investigate Valmoja's allegations.  Doc. No. 66-3, Domingo Decl. ¶ 3.  According to Domingo, the investigation confirmed that Valmoja's allegations in her EEOC complaint were regarding incidents that occurred while Valmoja was working for Akal, and there were no other complaints (save for the May 22, 2009 incident).  *Id.*; *see also* Doc. No. 66-4, Hayakawa Decl. ¶ 4.

Despite HDOT's assertions that there were no complaints after the May 22, 2009 incident between Morris and Valmoja, on December 10, 2009, Valmoja filed a second EEOC complaint, this time against HDOT, asserting sexual harassment and retaliation based on additional incidents with Morris. Valmoja's EEOC complaint describes the incident when Morris interrogated her regarding her first EEOC complaint and the resulting written warning to Morris,

and further alleges that in June 2009, trainer Kenneth Gaymon

> created a schedule that gave me and Mr. Morris the same
> days off, required that I relieve Mr. Morris, and that we
> attend training together.  I informed Mr. Gaymon that I
> did not agree with this schedule, who informed me that
> James Pratt, Acting Airport Manager, needed a schedule
> and that he was going to submit it.

*See* Doc. No. 66-15, Defs.' Ex. 8.

Domingo first learned of these events comprising the second EEOC

complaint when he received a copy of it in December 2009.  *See* Doc. No. 113-4,

Pl.'s Ex. 4 at 41-42.  Domingo asserts that he investigated this second EEOC

complaint for purposes of responding to the EEOC, and interviewed Sidney

Hayakawa, FCC Combs, Ronald Ome, and James Pratt.  Domingo did not,

however, take any notes from these interviews, and he did not interview Morris or

Valmoja.  *Id.* at 42-52.  According to Domingo, he was unable to substantiate

Valmoja's claims and finished his investigation by providing a response to the

EEOC.  Doc. No. 66-3, Domingo Decl. ¶ 4.

### 3.    *Valmoja's TRO Against Morris and Mediation Agreement*

By March 2010, HDOT had not taken any concrete action to separate

Morris from Valmoja (aside from the written warning), and Valmoja continued to

have shifts scheduled with Morris.  *See* Doc. No. 113-5, Pl.'s Ex. 5.  In a March

19, 2010 email to Ome, Valmoja complained about HDOT's inaction and Morris' continued conduct:

> I feel that my employer and all applicable parties has had enough time to address my complaint. I have every right to have a work environment free of harassment and violence. Mark Morris has been allowed to continue employment with his harassing and violent behaviors without any disciplinary actions and therefore, at this point, I feel unsafe and historically, he continues to repeat these behaviors. Since he now feels free to approach me at work, I strongly feel that Morris' behavior will escalate again and jeopardize my safety and well being at the airport.
> My fear of Morris' actions are based on:
> 1.) His history and pattern of harassment and violence; and allowed to continue [sic]
> 2.) Morris never receives disciplinary action, only an abundance of verbal/written warnings
> 3.) After SOF and Akal learned of my complaint, zero actions including training were taken to assure my safety in the work place
> 4.) Morris progressively started approaching me again after being given a warning
> 5.) Everyone ignores my complaint, including my requests to be separated from Morris

*Id.*

That same day, Valmoja sought a temporary restraining order ("TRO") against Morris in Hawaii state court. *See* Doc. No. 114-8, Pl.'s Ex. 13. In support of her request, Valmoja recited the events outlined in her two EEOC complaints, and further asserted that from September 2009 to the present, Morris

8

had approached her at work "trying to start conversations, saying hello and

blowing his vehicle horn and sending me an email requesting to take pictures with

his personal camera." *Id.* Valmoja explained that she was seeking a TRO because

her requests to be separated from Morris at work have been denied, and HDOT has

taken "zero action." *Id.* On March 22, 2010, Valmoja was granted a TRO

prohibiting Morris from contacting her or intentionally coming within 10 feet of

her. *See* Doc. No. 66-25, Defs.' Ex. 18, at ECF page 32 of 68.

On April 9, 2010, Valmoja and Morris entered into a court mediation

agreement that they would not have contact with each other except for specific

work obligations in which they will stay at least ten feet away from each other.

*Id.* at ECF page 38 of 68.

HDOT subsequently learned of the TRO and mediation agreement,

and Hayakawa asserts that HDOT adopted the requirements of the TRO and put

into place safeguards to ensure that Valmoja was safe in the workplace. *See* Doc.

No. 66-3, Hayakawa Decl. ¶ 5. Hayakawa also set up a meeting between HDOT

Deputy Director Francis Keeno and Valmoja "to assure [her] that it is the

[HDOT's] responsibilities to provide [her] with safe working environment" in

accordance with HDOT policies. Doc. No. 66-18, Defs.' Ex. 11. To that end, on

May 3, 2010, Hayakawa sent HDOT's policy on sexual harassment to Joe Guyton

for dissemination to the canine handlers.  Doc. No. 66-23, Defs.' Ex. 16.  Further,

HDOT updated the schedule for canine handlers to ensure that there was no

overlap between Valmoja and Morris.  *See* Doc. No. 66-4, Hayakawa Decl. ¶ 9.

HDOT also assigned an investigator from the State of Hawaii's

Attorney General's Department, Roy Kajiuye, to investigate all of Valmoja's

outstanding claims.  Doc. No. 66-17, Defs.' Ex. 10; Doc. No. 66-4, Hayakawa

Decl. ¶ 6.  As part of that investigation, on April 15, 2010, Kajiuye interviewed

Valmoja, who described several additional incidents regarding Morris that were

not recited in her EEOC complaints, including that (1) in January 2009, Morris

made body movements behind her and said "Hey sexy, whatcha doing?" while she

was placing water in the kennel; (2) in June and July 2009, Morris intentionally

stayed past his shift time at the K-9 office to see her, forcing her to stay away from

the office; (3) from September 2009 through February 2010, Morris repeatedly

attempted to start conversations with her, followed her, and gave her money for

food and commented "how he liked the way she made sandwiches;" (4) in

February 2010, Morris made an illegal turn with his vehicle towards her, slowed

down, and then drove away; and (5) in March 2010, Morris approached another

handler to ask explicit and intimate questions regarding who Valmoja was dating.

Doc. No. 114-7, Defs.' Ex. 12.

On May 11, 2010, Kajiuye completed his investigation of Valmoja's allegations dating from 2008 through the date of investigation.  Doc. No. 66-25, Defs.' Ex. 18.  Although the investigation's result was inconclusive and no disciplinary action was recommended, HDOT continued to honor the terms of Morris' and Valmoja's mediation agreement.  Doc. No. 66-4, Hayakawa Decl. ¶ 10.

On May 25, 2010, Ome was instructed to check with Valmoja to make sure there had been no recent problems with Morris harassing her, and he reported back that Morris had not been sexually harassing her.  Doc. No. 66-26, Defs.' Ex. 19; *see also* Doc. No. 66-27, Defs.' Ex. 20.

### 4. *Withholding of Valmoja's Wages*

While the events surrounding the TRO and mediation agreement were taking place, Valmoja was staying at home to take care of her working dog, Grendo, who had suffered an eye injury and was removed from duty to recover. *See* Doc. No. 116-9, Pl.'s Ex. 41; *see* Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶¶ 8-10.  Specifically, Valmoja stayed home to care for Grendo from March 5, 2010 through April 20, 2010, during which time Grendo required constant supervision.  *See* Doc. No. 118-8, Hayakawa Decl. ¶ 7.

Valmoja asserts that after she obtained her March 22, 2010 TRO

against Morris, Hayakawa told her that he was in charge of her sexual harassment complaint as well as her timesheets, which Valmoja submitted in the ordinary course. *See* Doc. No. 109-1, Pl.'s Ex. 41. Valmoja further asserts that on April 28, 2010, Hayakawa told her that she would not be paid for the time she was taking care of Grendo (even though such care was a normal part of her duties), *id.*, and HDOT did not start paying Valmoja any wages again until she returned with Grendo back to full duty. Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶¶ 11-12.

HDOT Contract Specialist Chris Murphy asserts that HDOT had adopted a policy for dogs on sick leave requiring canine handlers to show that they are performing services while the dog cannot work, which could be shown by caring for the dog at home, performing light duty with the dog at the airport, or doing office work without their dog. *See* Doc. No. 66-6, Murphy Decl. ¶ 3; *see also* Doc. No. 67-7, Defs.' Ex. 48 (April 21, 2010 email between Murphy and Pratt discussing issue of paying handlers for at-home care of dog and need for a policy). Murphy further asserts that the delays in wages to Valmoja were due to her failure to follow this policy and/or account for her time when Grendo was unable to work, and that she was paid for this time after she provided sufficient justification for the time requested. *See* Doc. No. 66-6, Murphy Decl. ¶ 4.

In comparison, Valmoja asserts that other canine handlers were paid

12

with no problems when their dogs were injured and they provided such medical

care.  Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶¶ 13-14.  Indeed, Morris

testified that he was always paid when his dog could not work due to physical

ailments, and that HDOT was "playing games" with Valmoja because of her

complaints.  Doc. No. 114-1, Pl.'s Ex. 6 at 95-97; *see also* Doc. No. 115-8, Pl.'s

Ex. 24 (asserting that handler Nathan Viduya was allowed to 'come into work"

and "do nothing" while his dog recovered from an injury); Doc. No. 115-3, Pl.'s

Ex. 19 (Ome interview stating similar facts as to Viduya).  Further, FCC Combs

testified that HDOT attempted to not pay Valmoja, despite his assurances that

Valmoja's salary would be reimbursable by the EDCTP.  Doc. No. 114-4, Pl.'s Ex.

9, FCC Combs Decl. ¶ 22; Doc. No. 115-2, Pl.'s Ex. 18.

As a result of HDOT withholding her wages, Valmoja filed a

complaint with the U.S. Department of Labor ("Labor Department"), which agreed

that Valmoja was entitled to the wages.  Doc. No. 116-12, Pl.'s Ex. 44, Valmoja

Decl. ¶¶ 13-16; *see also* Doc. No. 66-4, Hayakawa Decl. ¶ 29.  Ultimately, HDOT

made an offer of payment for the wages on August 30, 2010, which Valmoja

accepted.  *See* Doc. No. 118-8, Defs.' Reply Ex. 4; Doc. No. 118-8, Hayakawa

Decl. ¶ 8 (stating that HDOT compensated Valmoja $9,309.60 for this period of

time).  Valmoja was paid wages for the time period of March 5, 2010 to April 20,

2010 sometime in or after September 2010.  *See* Doc. No. 122.

On August 31, 2010, Valmoja filed a third EEOC complaint, asserting that this withholding of wages was in retaliation for her December 10, 2009 EEOC complaint.  *See* Doc. No. 116-9, Pl.'s Ex. 41.

### 5.   *Subsequent Harassment by Morris Resulting in His Suspension*

In the meantime, on July 15, 2010, Valmoja reported to Ronald Ome via email that for the last three weeks, she arrived at work to find the framed photograph of her dog Grendo face down in multiple places in the office, and that Morris admitted to another employee that he had moved the photograph.  Doc. No. 66-30, Defs.' Ex. 23.  Valmoja asserted that she believed Morris was harassing her due to her EEOC complaints concerning the sexual harassment, and that "it is only a matter of time before his harassment/retaliation comes on stronger to me."  *Id.* On July 17, 2010, Ome responded, stating that Morris told him that he had moved the photograph to a more appropriate place in the office, and that HDOT would investigate this issue.  Doc. No. 66-31, Defs.' Ex. 24.

On July 19, 2010, an Airport Duty Manager was assigned to investigate Valmoja's complaint, Doc. No. 66-32, Defs.' Ex. 32, resulting in an August 30, 2010 memorandum finding that Morris' moving of the photograph constituted prohibited contact under the mediation agreement, and recommending

14

Morris' termination. Doc. No. 66-33, Defs.' Ex. 26. Pratt concurred, writing that

"I think Mr. Morris is likely to continue to violate the Mediation Agreement as

long as they both remain employed as canine handlers at HNL. I recommend that

the PSC for Mr. Morris be terminated as soon as possible." *Id.* at 00008.

Hayakawa and the Interim Director of HDOT Michael Formby also concurred

with the termination on September 21 and 22, 2010, respectively. *Id.* at 00009.

On October 29, 2010, Morris learned of his impending termination by

Ome, *see* Defs.' Ex. 29, and asked Formby to overturn the decision. *See* Doc. No.

66-39, Defs.' Ex. 32. FCC Combs also contacted Formby to reconsider the

termination decision. *See* Doc. No. 66-40, Defs.' Ex. 33. Hayakawa asserts that

FCC Combs expressed to HDOT staff that Morris' termination would violate

HDOT's agreement with TSA, and that Morris was necessary for the operational

needs of the TSA. Doc. No. 66-4, Hayakawa Decl. ¶ 19. Formby agreed to re-

evaluate the termination decision, and instead imposed a ten-day suspension with

a warning that any further infraction of the mediation agreement may result in

termination.[2] *See* Doc. No. 66-41, Defs.' Ex. 34.

According to Hayakawa, HDOT felt that it was at FCC Combs'

---

[2] Morris also appealed his ten-day suspension, which was denied. *See* Doc. No. 66-45, Defs.' Ex. 38.

"mercy" regarding canine handlers -- FCC Combs had previously offered a canine

handler position to Nathan Viduya without following State of Hawaii procurement

rules, and the TSA never responded to Formby's request for assistance in

investigating FCC Combs' conduct, which suggested to HDOT that it had no

recourse against FCC Combs.  *See* Doc. No. 66-38, Defs.' Ex. 31; Doc. No. 66-4,

Hayakawa Decl. ¶¶ 16-17.  Hayakawa further asserts that FCC Combs alluded to

having the last say on canine handlers, and that his interference "made it difficult,

if not impossible, for HDOT to properly manage the canine program."  Doc. No.

66-4, Hayakawa Decl. ¶ 18.[3]

In comparison, FCC Combs asserts that (1) "[m]anagement of the

canine handlers is exclusively under the State's control," Doc. No. 114-9, Pl.'s Ex.

9, Lyle Combs Decl. ¶ 5; (2) he had no control over the canine handlers' day-to-

day duties and no authority to hire or terminate any canine handlers, *id.* ¶¶ 9, 10,

16; and (3) he had no authority to direct anyone at HDOT to rescind Morris'

termination, never directed anyone at HDOT to rescind Morris' termination, and

did not interfere or threaten anyone at HDOT regarding rescinding Morris'

---

[3]  As a result of FCC Combs' perceived influence over the termination decision, on
November 30, 2010, HDOT requested legal guidance from the Attorney General's Office on
HDOT's rights to terminate an employee or contractor under the PSC.  Doc. No. 66-4, Hayakawa
Decl. ¶ 22.

termination.  *Id.* ¶¶ 12-14.

> **6.      *Expiration of Morris' PSC***

On January 9, 2011, Valmoja called the Airport Sheriffs' Division

after Morris drove his vehicle into the cargo facility she was checking with her

dog Grendo, stopped short of where she was working, slowly reversed out of the

facility, and then remained in the general area until told to leave by the Sheriffs'

Division.  *See* Doc. No. 66-47, Defs.' Ex. 40; Doc. No. 67-2, Defs.' Ex. 43.

Ronald Ome investigated this incident, and found that although Morris did not

intend to harass Valmoja, "his inability to follow instructions and poor judgment

did traumatize [Valmoja]."  Doc. No. 67-2, Defs.' Ex. 43.

Both Valmoja and Morris subsequently declined mediation, *see* Doc.

No. 67-4, Defs.' Ex. 45, and on March 31, 2011, HDOT chose not to renew

Morris' PSC.  Doc. No. 67-6, Defs.' Ex. 47; Doc. No. 114-1, Pl.'s Ex. 6 at 98.  At

this same time, HDOT renewed Valmoja's PSC for an additional year.  *See* Doc.

No. 66-4, Hayakawa Decl. ¶ 27.

> **7.      *Additional Instances of HDOT Withholding Valmoja's Wages***

In May 2011, Grendo received leg surgery and could not work from

May 3, 2011 to May 17, 2011 while he recovered.  Doc. No. 116-12, Pl.'s Ex. 44,

Valmoja Decl. ¶ 17; Doc. No. 122.  Again, Valmoja provided at-home care for

Grendo, and again, HDOT refused to pay her until after Valmoja filed another complaint with the Labor Department, which determined that Valmoja was entitled to payment.  Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶ 18. Ultimately, Valmoja was not paid wages for this time period until sometime in or after July 2011.  Doc. No. 122.

In July or August 2011, Valmoja needed to board Grendo for a vacation, and attended acclimatization sessions with Grendo to get him used to other people to allow him to be boarded.  Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶ 20.  Valmoja was told that to get paid, she would need to report to work to help with administrative duties and filing in Murphy's office.  *See* Doc. No. 66-4, Hayakawa Decl. ¶ 31; *see also* Doc. No. 67-12, Defs.' Ex. 53 (email from Murphy outlining what he expects of Valmoja).  Valmoja refused to perform administrative duties for Murphy on the basis that she is a canine handler, not an administrative assistant.  Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶ 21.  Ome agreed with Valmoja -- requiring her to act as a file clerk was inappropriate for a dog handler, and another handler whose dog was injured, Nathan Viduya, was allowed to come to work and assist in the kennel office and participate in training as opposed to perform filings.  Doc. No. 115-3, Pl.'s Ex. 19; *see also* Doc. No. 116-5, Pl.'s Ex. 37 (email from Scott Haida to Murphy stating that Murphy's requirement that

18

Valmoja perform administrative work was never done by any other handler).

Instead of performing administrative duties for Murphy, Valmoja attended weekly

training sessions, which were necessary for her to maintain her TSA certification.

Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶ 21.

HDOT again withheld her wages, and Valmoja filed yet another

complaint with the Labor Department, which found in Valmoja's favor. *Id.* ¶ 22.

HDOT paid Valmoja wages for this time period sometime in or after October

2011. Doc. No. 122.

Valmoja filed a workplace claim against Murphy and Ome asserting

that the withholding of her wages for Grendo's acclimation was retaliatory. *See*

Doc. No. 66-4, Hayakawa Decl. ¶ 33. A subsequent investigation by the Attorney

General found on January 17, 2012 that Murphy failed to provide proper

information and guidance to Valmoja and failed to adhere to the rules of conduct,

resulting in a reprimand against Murphy. *See id.* ¶ 40.

### 8.   *Valmoja's Injury and Workers' Compensation*

On October 13, 2011, HDOT learned that Valmoja was injured in a

car accident during work hours. *See* Doc. No. 67-20, Defs.' Ex. 61. HDOT

subsequently determined that she was entitled to workers' compensation, and

Valmoja remained on leave until HDOT terminated her on May 15, 2012. *See*

Doc. No. 66-4, Hayakawa Decl. ¶¶ 36, 43.

For much of the time Valmoja was on leave, HDOT failed to pay her any workers' compensation wages, resulting in Valmoja not receiving any wages whatsoever from October 13, 2011 to mid February 2012.  Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶ 24.  Hayakawa asserts that this delay in payment was due to processing requirements of the Department of Human Resource Development. *See* Doc. No. 66-4, Hayakawa Decl. ¶ 39.

Valmoja's leave also raised the issue of whether she could care for Grendo while being at 100% disability.  *See id.* ¶ 36.  On November 23, 2011, Murphy directed Ome to remove Grendo from Valmoja's care and place him in a kennel on the basis that Valmoja should not be performing any duties until she is cleared to work, which includes caring for Grendo.  Doc. No. 67-21, Defs.' Ex. 62. Murphy explained that there may be an issue of having Valmoja perform work by caring for Grendo while at the same time being on workers' compensation such that Grendo needed to be removed from her care.  *Id.*

On November 30, 2011, Valmoja complained to Ronald Ome that Murphy was retaliating against her for her EEOC complaints, *see* Doc. No. 109-1, Pl.'s Ex. 22, and on December 7, 2011, this internal complaint was forwarded to Clifton Harty, EEO Specialist, and Murphy's immediate boss, Pratt.  *See* Doc. No.

115-7, Pl.'s Ex. 23.  According to Valmoja, HDOT had no protocol for removing a dog when the handler is injured, and the historical solution was to keep the dog with the handler.  Doc. No. 113-1, Pl.'s Ex. 1 at 352-353.  Valmoja also provided a note from her doctor stating that she may take care of Grendo while she is recovering.  *See* Doc. No. 115-7, Pl.'s Ex. 23.  Both Ome and FCC Combs recommended that Grendo stay in Valmoja's care, and Grendo was ultimately not taken from her.  *See* Doc. No. 115-6, Pl.'s Ex. 22; Doc. No. 115-7, Pl.'s Ex. 23.

On January 24, 2012, Valmoja filed an EEOC complaint against HDOT alleging retaliation from July 20, 2011 through January 20, 2012, asserting that (1) in May 2011, she had complained to Murphy that HDOT was not taking appropriate action as to her sexual harassment complaint, in part because they had not received sexual harassment training; (2) Murphy handled her kenneling of Grendo and her care of him while on workers' compensation differently than other handlers by requiring more paperwork and different duties from Valmoja; and (3) her complaints of retaliation were not investigated internally.  Doc. No. 115-8, Pl.'s Ex. 24.

### 9. *Valmoja's Termination*

By April 2012, Valmoja and Grendo were in danger of no longer being current on their certifications.  *See* Doc. No. 66-4, Hayakawa Decl. ¶ 42.  As

a result, on April 4, 2012, FCC Combs emailed Valmoja stating that she must either return to work or risk having Grendo retired or returned back to Lackland Air Force Base for retraining. *See* Doc. No. 67-25, Defs.' Ex. 67; *see also* Doc. No. 67-27, Defs.' Ex. 68 (email from FCC Combs recommending some training when Valmoja returns, and noting that other handlers have had much longer absences).

In the meantime, HDOT began termination proceedings on Valmoja's PSC. In an April 3, 2012 email, Murphy queried whether her status on workers' compensation would "produce any issues that we need to be aware of prior to giving her the 30 days notice of termination of contract." *See* Doc. No. 115-15, Pl.'s Ex. 31. According to Hayakawa, HDOT decided to terminate Valmoja (as opposed to let her PSC expire as it did with Morris) because she would no longer be certified and the canine program was scheduled to be turned over to armed uniformed Deputy Sheriffs. *See* Doc. No. 66-4, Hayakawa Decl. ¶ 42. Further, Valmoja failed to answer HDOT's inquiry regarding when she would be returning from workers' compensation leave. *Id.* ¶ 43; *see also* Doc. No. 67-28, Defs.' Ex. 69. During this same time, however, HDOT renewed the contract of another canine handler, Nathan Viduya, who was not TSA certified at the time and therefore could not perform the majority of his duties. *See* Doc. No. 115-4, Pl.'s

22

Ex. 20, at 320-23.

On May 15, 2012, HDOT terminated Valmoja's PSC.  *See* Doc. No.

67-29, Defs.' Ex. 70.  In a February 5, 2013 EEOC interview, Murphy stated:

> The decision to not renew her contract was made by
> Sydney Hayakawa.  My recommendation was to not
> renew her contract, but he changed it to a termination.
> We were going to discuss her performance issues, as she
> was having problems going to work, the issues
> surrounding acclimation, and some other things.  As she
> was a contractor, I could let her go.  I did not want to
> deal with her anymore.
> We brought up these issues to him, and he asked why we
> should just not cancel her contract.  I said let it run its
> course, but he said let's let her go.  It was only about two
> weeks' difference.
> I discussed this with Jim Pratt and Farrin Souza.  He
> agreed that we did not need to deal with that.  It was
> causing us too much problems.

Doc. No. 115-9, Pl.'s Ex. 25.

On May 25, 2012, Valmoja amended her most recent EEOC

complaint to include the allegation that her termination was retaliatory.  *See* Doc.

No. 115-11, Pl.'s Ex. 27.

**B.    Procedural Background**

On May 5, 2014, Plaintiff filed this action asserting Title VII claims

for hostile work environment on the basis of sex, and retaliation, and seeking

compensatory damages, front and back pay, and injunctive relief.

23

On May 26, 2015, Defendants filed their Motion for Summary Judgment.  Doc. No. 66.  Plaintiff filed an Opposition on July 20, 2015, Doc. No. 110, and Defendants filed a Reply on July 27, 2015.[4]  Doc. No. 118.  A hearing was held on August 10, 2015.  On August 14, 2015, the parties submitted a joint one-page statement regarding HDOT's withholding of Valmoja's wages.  Doc. No. 122.

## III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of

---

[4] On August 7, 2015, Plaintiff filed a Motion to Strike portions of Defendants' argument, declarations, and exhibits made in support of their Reply. *See* Doc. No. 120.  Because none of these arguments or evidence establishes the lack of a genuine issue of material fact and without determining the admissibility of any of the evidence at trial, the court DENIES the Motion to Strike.

the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

25

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. <u>DISCUSSION</u>

Defendants argue that Plaintiff has failed to create a genuine issue of material fact in support of its Title VII hostile work environment and retaliation claims, and that Plaintiff is not entitled to injunctive relief as a matter of law. The court addresses each of Plaintiff's claims in turn.

**A.    Hostile Work Environment on the Basis of Sex**

Defendants argue that Plaintiff's hostile work environment claim fails for two reasons -- the harassment by Morris amounted to only a few isolated events that did not create a hostile work environment, and in any event HDOT took prompt action to investigate and remedy Morris' conduct. Based on the following, the court rejects this argument.

### 1.    *Whether Morris' Conduct Amounts to a Hostile Work Environment*

To establish a Title VII hostile work environment claim based on sexual harassment, a plaintiff must show "that: (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig v. M & O*

26

*Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)); *see also Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1109-10 (9th Cir. 2000).

      In determining whether a work environment is so hostile as to violate Title VII, courts "consider whether, in light of 'all the circumstances,' the harassment is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112-13 (9th Cir. 2004) (citations omitted); *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) ("We use a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment."). "A plaintiff must show that the work environment was both subjectively and objectively hostile." *McGinest*, 360 F.3d at 1113. In determining whether a work environment is objectively offensive, the court should consider various factors, including "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotations omitted).

      The perspective of the reasonable victim -- in this case, a reasonable

woman -- is assumed when assessing the objective portion of a plaintiff's claim. *See Brooks*, 229 F.3d at 924; *see also Ellison v. Brady*, 924 F.2d 872, 878-79 (9th Cir. 1991) ("[A] female plaintiff states a prima facie case of hostile environment sexual harassment when she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment.").

The facts, viewed in a light most favorable to Plaintiff, establish that Valmoja was subjected to numerous instances of sexual harassment by Morris, both while employed at Akal and at HDOT, which were sufficiently severe and pervasive to alter the conditions of her employment.  In particular, while they were employed with Akal, Valmoja reported that from November 2008 through February 2009, Morris "has made unwelcome sexual comments and sexual innuendos toward me by calling me his 'brown baby'; he has repeatedly stated that he likes the way I put my make up on; and he likes the way my perfume smells and it makes him want to do things toward me."  *See* Doc. No. 66-8, Defs.' Ex. 1 at 00005.  She further relayed that in one instance, Morris grabbed her, hugged her, and tried to kiss her, and then laughed at her when she told him not to touch her. *Id.*

After they became HDOT employees, Morris confronted Valmoja

about her EEOC Complaint, *see* Doc. No. 66-11, Defs.' Ex. 4, which resulted in a

written warning.  Despite this warning, Morris (1) continued to approach her

"trying to start conversations, saying hello and blowing his vehicle horn and

sending [her] an email requesting to take pictures with his personal camera," Doc.

No. 109-1, Pl.'s Ex. 5; (2) stayed past his shift time at the K-9 office to see her,

forcing her to stay away from the office, Doc. No. 109-1, Defs.' Ex. 12;

(3) approached another handler to ask explicit and intimate questions regarding

who Valmoja was dating, *id.*; and (4) for a period of several weeks moved her

framed photograph of Grendo throughout the office.  Doc. No. 66-30, Defs.' Ex.

23.  According to Valmoja, between April 1, 2009 and the time Morris was

terminated, Valmoja saw him three to five times a week, and "[a]s often as I saw

[him] he was harassing me."  *See* Doc. No. 109-1, Pl.'s Ex. 44, Pl.'s Ex. 44.

      Given the content of the contacts between Morris and Valmoja, along

with their frequency and pervasiveness, the court has little difficulty finding that a

reasonable woman under these circumstances would find this working

environment hostile.  In particular, a reasonable woman, after being unwillingly

grabbed, hugged, and subjected to sexual comments and sexual innuendos while

employed at Akal, would find Morris' conduct while employed at HDOT of

constantly approaching her, asking others about her personal life, and touching her

belongings both abusive and comprising sexual harassment.  *See Ellison*, 924 F.2d

at 879 (explaining that the standard is that of a reasonable woman, "because

women are disproportionately victims of rape and sexual assault, women have a

stronger incentive to be concerned with sexual behavior.  Women who are victims

of mild forms of sexual harassment may understandably worry whether a

harasser's conduct is merely a prelude to violent sexual assault.").  In other words,

although some of Morris' conduct taken alone may appear benign and not of a

sexual nature, in context with his other conduct, a reasonable woman could

certainly consider it so.

In opposition, Defendants appear to suggest that the only harassment

of an overtly sexual nature by Morris occurred while they were employed by Akal

and that the few minor incidents that occurred while they were HDOT employees

do not rise to the level of a hostile work environment.  *See* Doc. No. 118, Defs.'

Reply at 8-9.  This argument not only ignores the evidence recited above regarding

the numerous events occurring during their HDOT employment, but also suggests

that the events occurring during their Akal employment have no bearing on what

occurred during their HDOT employment and how a reasonable victim would

view Morris' contacts.  Although HDOT is not be liable for harassment occurring

at Akal, the conduct at Akal provides important context of how a reasonable

woman would view Morris' continued conduct while employed at HDOT.

The court therefore DENIES Defendants' Motion for Summary Judgment to the extent it argues that there is no genuine issue of material fact that Valmoja was subjected to a hostile work environment based on sex.

### 2.    HDOT Liability for Harassment by a Co-Worker

"Under Title VII, an employer's liability for [] harassment may depend on the status of the harasser.  If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).  In such a context, "employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known."  *McGinest*, 360 F.3d at 1119 (internal quotation marks and citation omitted); *see also Vance*, 133 S. Ct. at 2441 (stating that courts require the plaintiff to show that "the employer knew or reasonably should have known about the harassment but failed to take remedial action").

An employer avoids "liability for such harassment by undertaking remedial measures 'reasonably calculated to end the harassment.'"  *McGinest*, 360 F.3d at 1120 (citing *Ellison*, 924 F.2d at 882).  "The reasonableness of the remedy

31

depends on its ability to: (1) 'stop harassment by the person who engaged in the harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *Id.* (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 875 (9th Cir. 2001)).  To be adequate, such action by an employer must be taken "promptly." *Id.*  "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant" in determining whether the employer failed to prevent or remedy a racially hostile environment. *Vance*, 133 S. Ct. at 2453.

Applying these principles, the court finds that the facts, viewed in a light most favorable to Plaintiff, raise a genuine issue of material fact as to whether HDOT was negligent in controlling Valmoja's working conditions to prevent further harassment by Morris.  Specifically, by May 2009, HDOT was aware of Valmoja's sexual harassment complaints, yet HDOT did little to actually separate Valmoja from Morris.  For example, in her December 10, 2009 EEOC complaint, Valmoja asserted that despite her complaints of harassment and the warning to Morris, her supervisors were still creating a schedule that "gave me and Mr. Morris the same days off, required that I relieve Mr. Morris, and that we attend training together." *See* Doc. No. 66-15, Defs.' Ex. 8.  In March 2010 --

32

three months after her December 10, 2009 EEOC complaint -- HDOT still had not

taken any concrete action to keep Valmoja separated from Morris, and Valmoja

therefore sought a TRO to ensure that Morris would be kept away from her.  *See*

Doc. No. 109-1, Pl.'s Ex. 5; Doc. No. 109-1, Pl.'s Ex. 13.  It was only after

Valmoja obtained a TRO -- and over ten months after HDOT learned of the

harassment -- that HDOT finally put into place safeguards to ensure that Valmoja

was safe in the workplace, created a schedule providing no overlap between

Valmoja and Morris, and assigned an investigator from the State of Hawaii's

Attorney General's Department to investigate all of Valmoja's outstanding claims.

*See* Doc. No. 66-3, Hayakawa Decl. ¶¶ 5, 6, 9.

    And when Morris failed to follow these "safeguards," HDOT again

took months to investigate and eventually discipline Morris.  For example,

Valmoja reported on July 15, 2010 that Morris had moved her photograph of

Grendo multiple times over the course of a three-week period, Doc. No. 66-30,

Defs.' Ex. 23, yet the termination recommendation was not made until September

22, 2010, Doc. No. 66-33, Defs.' Ex. 26, and HDOT did not even notify Morris of

the decision (which was ultimately changed to a ten-day suspension) until October

29, 2010.  *See* Doc. No. 66-36, Defs.' Ex. 29.  Further, although Valmoja called

the Sheriff's Division on January 9, 2011 to report improper contact with Morris,

33

Doc. No. 66-47, Defs.' Ex. 40, HDOT kept Morris as an employee for another two months, simply letting his PSC end on March 31, 2011.  Doc. No. 67-6, Defs.' Ex. 47.  These multiple instances of delay between the improper contact and remedy raise questions of fact whether HDOT took prompt, "remedial measures 'reasonably calculated to end the harassment.'" *McGinest*, 360 F.3d at 1120 (citing *Ellison*, 924 F.2d at 882).

In opposition, Defendants argue that HDOT took proper action by investigating each of Valmoja's complaints.  But investigations, standing alone, are not a basis to absolve HDOT of liability on summary judgment.[5]  As *Fuller* explains:

> An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have "remedied" what happened.  Denial does not constitute a remedy.  Nor does the fact of investigation alone suffice; an investigation is principally a way to determine whether any remedy is needed and cannot substitute for the remedy itself.

47 F.3d at 1529.  Especially in this case where each investigation took months and little actual action was taken to prevent further harassment, issues of fact exist as whether HDOT took prompt action in response to Valmoja's complaints and

---

[5]  The parties further dispute the adequacy of the investigations, an issue the court need not address in this Order.  *See, e.g.*, Doc. No. 110, Pl.'s Opp'n at 17-18 (arguing that HDOT's investigations were deficient).

whether the actions it took were reasonable.

In further opposition, Defendants argue that any delays in reprimanding and/or terminating Morris were caused by TSA employee FCC Combs, over whom HDOT had no control and who essentially forced HDOT to keep Morris employed after he violated the mediation agreement. *See* Doc. No. 66-1, Defs.' Mot. at 33. Such fact, if true, does not explain the delays in HDOT's investigations and the factual questions as to whether Defendants took prompt action in remediating the harassment. And in any event, FCC Combs' influence over hiring decisions is disputed -- although Hayakawa asserts that HDOT felt that it was at FCC Combs' "mercy" regarding canine handlers, *see* Doc. No. 66-38, Defs.' Ex. 31; Doc. No. 66-4, Hayakawa Decl. ¶¶ 16-17, FCC Combs asserts that he had no control over the canine handlers' day-to-day duties and no authority to hire or terminate any canine handlers.[6] Doc. No. 114-4, Pl.'s Ex. 9, Lyle Combs Decl. ¶¶ 9, 10, 16.

The court therefore DENIES Defendants' Motion for Summary Judgment on Plaintiff's Title VII hostile work environment claim.

---

[6] Defendants also argue that FCC Combs' Declaration is contradicted by exhibits showing his input into canine handler program, as well as statements by Valmoja asserting that FCC Combs protected Morris from termination and fostered a hostile work environment. *See* Doc. No. 118, Defs.' Reply at 6. At the summary judgment stage, the court cannot weigh the evidence or make credibility determinations. Rather, the court views the evidence in a light most favorable to Plaintiff, the non-moving party. *See Soremekun*, 509 F.3d at 984.

**B.      Retaliation for Engaging in Protected Activity**

         Plaintiff asserts that HDOT retaliated against Valmoja for her internal

complaints and EEOC complaints alleging sexual harassment and retaliation by,

among other things, withholding her wages for four different time periods while

Grendo was unable to work, attempting to take Grendo away from her, and by

terminating her PSC.  Applying the *McDonnell Douglas* framework,[7] Defendants

argue that Plaintiff has failed to establish a prima facie case of retaliation, and in

any event, HDOT had legitimate, nondiscriminatory reasons for the actions it took

against Valmoja.  The court first outlines the legal framework for Title VII

retaliation claims, and then addresses Defendants' arguments.

*1.      Legal Framework*

         An employer may not discriminate against an employee because the

employee has opposed an employment practice made unlawful by Title VII.  42

U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an

employer to discriminate against any of his employees . . . because he has opposed

any practice [prohibited by Title VII] . . . or because he has made a charge,

_____

         [7]  "[W]hen responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]."  *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest*, 360 F.3d at 1122).  The court proceeds under the *McDonnell Douglas* framework because the parties present their arguments under this framework.

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing under [Title VII]."). Under the *McDonnell Douglas* framework, the

plaintiff "first must establish a prima facie case of discrimination or retaliation."

*Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008). The plaintiff

must show that (1) she opposed an employment practice made unlawful by Title

VII; (2) the defendant took an adverse action against her; and (3) there was a

causal link between her involvement in this opposition and the adverse action

taken by the defendant. *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006);

*McGinest*, 360 F.3d at 1124.

        To establish a causal link between the protected activity and the

adverse action, the plaintiff must show that the retaliatory motive was the "but for"

reason for the unlawful employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved

according to traditional principles of but-for causation."). The "but for" causal

link does not require that the causative event be the *sole* cause of the adverse

action; it simply "requires proof that the unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or actions of the employer."

*Id.* Causation can be inferred by a temporal proximity between the protected

activity and the adverse action, where the action follows "close on the heels" of

the complaint.  *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  The adverse employment action must be "very close" to support a theory of causation based on timing alone.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam) (holding that an adverse employment action taken 20 months after the protected conduct "suggests, by itself, no causality at all"); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) ("We have held that causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.") (citation and quotation marks omitted).

        If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to offer a legitimate, non-discriminatory explanation for the challenged action.  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).  If the defendant proffers such a reason, the burden shifts back to the plaintiff to show that the defendant's reason is actually a pretext for discrimination.  *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and quotation omitted).

        "[A] plaintiff's burden is much less at the prima facie stage than at the pretext stage."  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010).  That is, circumstantial evidence of pretext must be specific and

substantial,[8] *see Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1163

(9th Cir. 2009) (per curiam), and a plaintiff must do more than merely deny the

credibility of the defendant's proffered reason. *See Schuler v. Chronicle Broad.*

*Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). "A plaintiff can show pretext directly,

by showing that discrimination [or retaliation] more likely motivated the

employer, or indirectly, by showing that the employer's explanation is unworthy

of credence." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2004);

*see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).

"Direct evidence typically consists of clearly sexist, racist, or similarly

discriminatory [or retaliatory] statements or actions by the employer." *Coghlan*,

349 F.3d at 1095. Circumstantial evidence requires an additional inferential step

to demonstrate discrimination. *Id.*

///

///

---

[8] The Ninth Circuit has questioned whether a "specific and substantial" showing is proper for circumstantial evidence, especially where it has noted that this standard "is tempered by our observation that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *See France v. Johnson*, --- F.3d ----, 2015 WL 4604730, at *5 (9th Cir. Aug. 3, 2015) (quoting *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011)); *see also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1030-31 (9th Cir. 2005). The Ninth Circuit has not, however, overruled this standard and has in fact suggested in other cases that "specific and substantial" evidence may be necessary for direct, as well as circumstantial, evidence. *See Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). The court therefore applies the "specific and substantial" standard to the present matter.

39

## 2. **Application**

There is little dispute as to the first two elements of Plaintiff's prima facie case.  First, Valmoja's internal complaints to her supervisors as well as formal EEOC complaints asserting sexual harassment and retaliation all constitute opposition of an employment practice made unlawful by Title VII.  Second, HDOT took adverse actions against her by withholding her wages and ultimately terminating her.[9]  The issues in dispute concern whether HDOT took these actions because of Valmoja's protected activity, and the burden-shifting legitimate reason/pretext analysis.

### a. *Causation*

On causation, Defendants largely ignore much of Plaintiff's claim -- Defendants do not address Valmoja's protected activities beyond her December

---

[9]  In a footnote, Defendants argue that the sole adverse employment action is Valmoja's termination, and that four instances of withholding her wages were not adverse because HDOT investigated each time and ultimately paid the wages.  *See* Doc. No. 66-1, Defs.' Mot. at 35 n.2.  Bluntly stated, this argument is ludicrous.

The Ninth Circuit defines the term "adverse employment action" "broadly."  *See Fonseca v. Sysco Food Servs. of Ariz., Inc*., 374 F.3d 840, 847 (9th Cir. 2004) (citing *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000)).  "An adverse employment action is 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'"  *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007) (quoting *Ray*, 217 F.3d at 1242-43); *see also Burlington N. & Santa Fey Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (stating that an adverse employment action is one which a reasonable employee would have found might well "have dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotation omitted).  The court has no difficulty finding that withholding an employee's wages for weeks and/or months would reasonably likely deter someone from engaging in protected activity.

2009 EEOC complaint, and ignore HDOT's adverse actions beyond her termination on May 15, 2012.  Instead, Defendants argue that Plaintiff cannot establish a causal connection where the adverse action of termination occurred roughly two and half years after her December 2009 EEOC complaint.[10]  *See* Doc. No. 66-1, Defs.' Mot. at 36-38.  Defendants further argue that Plaintiff cannot establish causation where Hayakawa supported Valmoja with her sexual harassment claims against Morris, and Murphy was not involved in the sexual harassment claims and therefore had no motive to retaliate against her.  Doc. No. 118, Defs.' Reply at 16-17.  The court rejects these arguments.

As an initial matter, Defendants ignore both Valmoja's numerous instances of engaging in protected activity throughout her employment with HDOT, as well as HDOT's adverse actions of withholding Valmoja's wages during four separate time periods.  Valmoja's protected activities occurred in close proximity to HDOT's first instance of withholding her wages -- HDOT first

---

[10]  In Reply, Defendants present argument and additional exhibits to assert that the withholding of wages was not retaliatory.  The court does not address arguments presented for the first time in a Reply.  *See, e.g.*, *Menashe v. Bank of N.Y.*, 850 F. Supp. 2d 1120, 1137 n.8 (D. Haw. 2012) ("[T]he court does not address arguments raised for the first time in Reply.") (citing *Hi-Tech Rockfall Constr., Inc. v. Cnty. of Maui*, 2009 WL 529096, at *18 n.9 (D. Haw. Feb. 26, 2009) ("Local Rule 7.4 provides that '[a]ny arguments raised for the first time in the reply shall be disregarded.'")) (other citation omitted).  The court does, however, point to the evidence presented to the extent necessary to fill in facts that the parties otherwise failed to present in the Motion and Opposition.

withheld Valmoja's wages from March to May 2010 when she was on leave taking

care of her injured service dog Grendo, which was only a few months after

Valmoja had filed her December 15, 2009 EEOC complaint, and contemporaneous

with her March 19, 2010 internal complaint to Ome that HDOT had taken no

action to stop Morris' harassment.  And the facts surrounding HDOT's

withholding Valmoja's wages further support that HDOT took this action because

of her protected activity -- other canine handlers were paid with no problems when

their dogs were injured, *see* Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶¶ 13-

14; Doc. No. 114-1, Pl.'s Ex. 6 at 95-97; Doc. No. 115-8, Pl.'s Ex. 24, HDOT

failed to pay Valmoja for months in each instance, and HDOT refused to pay

Valmoja three of the four times it withheld her wages until after the Labor

Department agreed with Valmoja that she was entitled to them.  Doc. No. 116-12,

Pl.'s Ex. 44, Valmoja Decl. ¶¶ 13-16.

These multiple instances of withholding Valmoja's wages and her

continued assertions of retaliation by HDOT provide context for her termination.

Viewed in a light most favorable to Plaintiff, the facts support the inference that

Valmoja's termination was simply the last of several escalating acts of retaliation.

Indeed, HDOT decided to terminate Valmoja only a couple of months after her

latest EEOC complaint, and renewed the PSC of Viduya, who was not TSA

certified.  *See* Doc. No. 115-4, Pl.'s Ex. 20, at 320-23.  Further, HDOT decided to

terminate Valmoja's PSC, even though the PSC was set to expire in only a couple

of weeks, and in contrast to how they handled Morris' discharge, where HDOT

allowed his PSC to expire despite ample reasons for termination.

 The court further rejects Defendants' argument that Murphy and

Hayakawa could not have retaliated against Valmoja because Murphy did not

become the canine handlers' supervisor until April 2011 (sometime after

Valmoja's sexual harassment claims), and Hayakawa had supported Valmoja's

sexual harassment claims.  Both Murphy and Hayakawa were well aware of

Valmoja's complaints that Morris sexually harassed her, that HDOT did not take

proper action, and that HDOT retaliated against her.  This knowledge, combined

with the proximity between Valmoja's protected activities and HDOT's adverse

actions, as well as the circumstances surrounding each adverse action, provide

ample basis raising a genuine issue whether HDOT took these adverse actions

because of her protected activities.

  b. *Legitimate reason for adverse action/pretext*

 Defendants argue that HDOT had legitimate reasons for taking the

adverse actions against Valmoja.  In particular, HDOT asserts that it withheld

Valmoja's pay during the three instances that Grendo was not able to work

because Valmoja failed to properly document her time, which was necessary especially where she was requesting significant amounts of overtime for caring for Grendo when he was injured.  *See, e.g.*, Doc. No. 118-4, Defs.' Ex. 77 (documenting Valmoja's hours worked during Grendo's eye injury, which included requests of up to 21 hours per day, and HDOT requesting more information regarding her duties during this time).  Defendants further assert that the delays in Valmoja receiving workers' compensation were due to the Department of Human Resource Development processing the request, *see* Doc. No. 66-4, Hayakawa Decl. ¶ 39, and the potential problem of Valmoja receiving workers' compensation at 100% while still taking care of Grendo, which was part of her work duties.  *See* Doc. No. 118, Defs.' Reply at 14-15.[11]  Finally, Defendants assert that HDOT terminated Valmoja because she failed to answer HDOT's questions regarding when she would return to work and she was in danger of losing certification.

Plaintiff, however, has likewise carried its burden of coming forward with specific and substantial evidence suggesting that these reasons are pretextual.

---

[11]  The evidence presented does not appear to support this latter reason for the delay in workers' compensation payments -- Hayakawa asserted that the delay was due to the Department of Human Resource Development processing the request, *see* Doc. No. 66-4, Hayakawa Decl. ¶ 39, and none of the evidence presented ties HDOT's concern about Valmoja taking care of Grendo with the delay in her getting paid.  And in any event, even assuming Defendants' argument is supported by evidence, the court finds that genuine issues of material fact still exist.

In particular, as to the withholding of wages, Plaintiff presented evidence that other canine handlers were paid with no problems when their dogs were injured, *see* Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶¶ 13-14; Doc. No. 114-1, Pl.'s Ex. 6 at 95-97; Doc. No. 115-8, Pl.'s Ex. 24, and HDOT refused to pay Valmoja her wages in three instances until after the Labor Department agreed that Valmoja was entitled to them, Doc. No. 116-12, Pl.'s Ex. 44, Valmoja Decl. ¶¶ 13-16; *see also* Doc. No. 66-4, Hayakawa Decl. ¶ 29, which suggests that the reason for the withholding was not simply a lack of documentation.  Indeed, even if there was an arguable issue regarding her requests for overtime over these time periods, HDOT offers no legitimate reason why it withheld *all* of her wages -- *i.e.*, both her regular wages and her requests for overtime -- when there was no real dispute that she was entitled to at least her regular hours and they could resolve the overtime hours separately.

Further, in the first instance that HDOT withheld Valmoja's wages, Hayakawa told her, just after she had complained to Ome and received a TRO against Morris, that he was in charge of her sexual harassment complaint as well as her timesheets, which suggests that HDOT was treating these two separate issues together.  *See* Doc. No. 116-9, Pl.'s Ex. 41.  In the third instance HDOT withheld Valmoja's wages, HDOT told Valmoja that to get paid, she would need

45

to report to work to help with filing in Murphy's office, *see* Doc. No. 66-4, Hayakawa Decl. ¶ 31; *see also* Doc. No. 67-12, Defs.' Ex. 53 (email from Murphy outlining what he expects of Valmoja), which no other canine handler was required to do and which resulted in Murphy being reprimanded.[12]  *See* Doc. No. 66-4, Hayakawa Decl. ¶¶ 33, 40; *see also* Doc. No. 116-5, Pl.'s Ex. 37 (email from Scott Haida to Murphy stating that Murphy's requirement that Valmoja perform administrative work was never done by any other handler).

      In the fourth instance, although HDOT asserts that the delay was from the Department of Human Resource Development processing the request and/or due to the issue of Valmoja taking care of Grendo while on workers' compensation, such delay on its face appears unreasonable where it resulted in Valmoja receiving no wages whatsoever for five or six months, and there was no real dispute that Valmoja was entitled to wages for this period of time.  Further, during this time, HDOT attempted to take Grendo away from her care, even though HDOT had no protocol for removing a dog when the handler is injured, and the historical solution was to keep the dog with the handler.  Doc. No. 113-1,

----

[12]  In Reply, Defendants assert that Viduya performed administrative duties when his dog was unable to work.  *See* Doc. No. 118, Defs.' Reply at 13-14.  Defendants misstate the evidence -- in comparison to Valmoja, who was ordered to perform administrative work for Murphy, Viduya performed work in the K-9 office and participated in training.  *See* Doc. No. 115-3, Pl.'s Ex. 19 at 3.

Pl.'s Ex. 1 at 352-353.  These facts, viewed in a light most favorable to Plaintiff,

suggest that HDOT's asserted reasons for withholding her wages were pretextual.

Finally, Plaintiff has also presented evidence that Valmoja's

termination was pretextual.  Although HDOT asserts that it terminated Valmoja

because she failed to answer HDOT's questions regarding when she would return

to work and she was in danger of losing certification, at the same time, HDOT

renewed Viduya's PSC, even though he was not TSA certified and therefore could

not perform the majority of his duties.  *See* Doc. No. 115-4, Pl.'s Ex. 20, at 320-

23.  That HDOT renewed Viduya's PSC informs Murphy's February 5, 2013

testimony in an EEOC interview that HDOT decided to terminate Valmoja

because she had issues "going to work, the issues surrounding acclimation, and

some other things," and that he "did not want to deal with her anymore."  Doc. No.

109-1, Pl.'s Ex. 25.  Viewed in a light most favorable to Plaintiff and combined

with HDOT's decision to renew Viduya's PSC and the instances of HDOT

withholding Valmoja's wages, Murphy's testimony supports the inference that

HDOT terminated Valmoja because of her complaints and not because of her

performance.  In other words, the cumulative impact of all of these facts, taken

together, support the inference that HDOT's asserted reasons for terminating

Valmoja were pretext.

In sum, there are multiple disputed issues of material fact regarding whether HDOT took the adverse actions against Valmoja because of her protected activity, and whether HDOT had legitimate reasons for its actions.  The court therefore DENIES Defendants' Motion for Summary Judgment on Plaintiff's Title VII retaliation claim.

## C.    Injunctive Relief

This court previously denied Defendants' Motion for Partial Judgment on the Pleadings, which argued that Plaintiff is not entitled to injunctive relief because such relief is not appropriate in an action brought pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, and Plaintiff failed to allege facts that plausibly support such relief.  *See* Doc. No. 65, *United States v. Hawaii*, 2015 WL 2186452 (D. Haw. May 11, 2015).  In particular, the court found that Section 706 allows Plaintiff to seek broad injunctive relief, and that Plaintiff had plausibly alleged incidents that could support the requested injunctive relief.  *Id.* at 13-14. Defendants now argue in conclusory fashion that Plaintiff's request for injunctive relief fails as a matter of law where the facts establish that there was no intentional employment discrimination.  *See* Doc. No. 66-1, Defs.' Mot. at 39.  Because the court finds that genuine issues of material fact exist as to both of Plaintiff's claims, the court rejects this argument and DENIES Defendants' Motion for Summary

48

Judgment as to Plaintiff's request for injunctive relief.

## V.  <u>CONCLUSION</u>

Based on the foregoing, the court DENIES Defendants' Motion for

Summary Judgment, Doc. No. 66.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 26, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. State of Hawaii, et al.*, Civ. No. 14-00214 JMS-RLP, Order Denying
Defendants' Motion for Summary Judgment, Doc. No. 66